Case No. 24-1350, Cboe Global Markets, Inc. et al. Petitioner v. Securities and Exchange Commission. Mr. Tehrani for the petitioners, Mr. Mitro for the respondents. Good morning, Council. Mr. Tehrani, please proceed when you're ready. Good morning, Your Honors, and may it please the Court. For three reasons, this Court should vacate the Commission's two-thirds reduction in the cap on exchanges' access fees. First, the Commission lacks the statutory authority to impose an across-the-board fee cap on all exchanges. Second, the Commission failed to acknowledge, let alone explain, its departure from its policy announced in the Fee Pilot Rule that further study was necessary before embarking on any reform to the exchange's fee and rebate model because it was unclear to the Commission at that time whether there was even a problem warranting regulation. And third, the Commission failed to justify slashing the longstanding three-tenths of a cent fee cap all the way down to one-tenth of a cent, which was a far larger reduction than necessary to achieve the Commission's supposed objective of accommodating the new sub-penny pricing increment. Turning to the threshold issue of statutory authority, the Commission has the authority to regulate exchanges' access fees on an exchange-by-exchange or case-by-case basis under Sections 19b of the Exchange Act and 19c of the Exchange Act. But what it does not have the authority to do is impose an across-the-board fee cap on all exchanges, invoking its general rulemaking power under Section 11a.c.1 of the Exchange Act. That's clear from the text and structure of the statute. So one of your clients told the SEC during proceedings that they should proportionately update the fee cap for at least .005 tick stocks to .0015, not the current one at all, so they should change it. That was NASDAQ. And that they should collect information and then do further analysis and then consider fee cap adjustments again later and reference the very authority invoked by the Commission here. So how can one of your clients tell the Commission they should adjust it, not to the exact number chosen here, but not that far off, .0015, and then they should study it after they make that first change. They should study it and adjust and make future changes, and yet you're here arguing that there's absolutely no authority to make any global changes at all. NASDAQ acknowledged that if the Commission were to adopt a new subpenny pricing increment, that there would need to be an adjustment to – Right, so yes, across the board, not exchange-by-exchange-by-exchange-by-exchange. Across the board. But you're arguing that statutorily there's no power for an across-the-board change. That's what I'm confused about. NASDAQ raised, and I'm quoting, significant concerns regarding the Commission's authority to engage in rate-making. That's at JA570. The Commission squarely addressed – Do you deny the description of NASDAQ's position to the Commission that I just recited to you and quoted to you? Your Honor, with respect, I deny that NASDAQ conceded that the Commission has the statutory authority to proceed on an across-the-board – We proposed that the Commission do this right up front when it was changing the tick size, and no one here is challenging the change to the tick size. We proposed that this be done and gave a precise number, and then proposed going forward further study of how that worked and possible further adjustments, and it made all those proposals even though it thought it would be unlawful for the Commission to do what it was proposing? NASDAQ was accounting for the possibility that the Commission might move forward with adopting the subpenny pricing increment and that the Commission might conclude that it had the authority to proceed on an across-the-board basis. On these submissions, does it say, we don't think you can change it at all even if you change the tick size, but if we're wrong, here's what we think you should do? Is that language in that comment? Your Honor, I don't think it's as explicit as that, but I would make three points in response. Is it there at all? The point that NASDAQ conveyed is that it had concerns, and let me quote – I think we have to admit that NASDAQ's position kept evolving and changing throughout this, but that it was quite firm that if you're changing the tick size, which no one disputes their authority to do, you've got to do this. And you should study it and make other changes going forward, which it's hard to reconcile that with a you have no authority because you wouldn't propose the second half of that. And by the way, let's study it and think about making further changes going forward unrelated to a change in tick size. Your Honor, the Commission squarely addressed NASDAQ's statutory objection. It is not arguing waiver or forfeiture in this court and has thus waived any waiver or forfeiture position, and there are multiple petitioners here. The points that you are making apply to NASDAQ, not to CBO. For all of those reasons – It seems like your clients have contradictory positions on this authority. What I'm having trouble understanding is if there's authority to make an across-the-board adjustment in response to the tick size change, then what in the statute says that you couldn't have made this change, this number, rather than the one that was proposed here? Your Honor, there is no statutory authority to make an across-the-board change in response to the tick size amendment. NASDAQ's point was that if the Commission moves forward with a reduction in the tick size and concludes that it has statutory authority to proceed on an across-the-board basis, then at a minimum, it does need to reduce the access fee cap so that the access fee does not exceed one-half of the new subpenny minimum pricing increment. Again, the Commission does not raise a waiver argument in this court. I just want to pick up on something you just said. Do you agree that if you were right that 19C means you have to proceed on an exchange-by-exchange basis instead of across-the-board? That would also mean the tick size amendment was improper. The tick size amendment is not statutorily improper. We're not arguing that – which would include tick sizes, wouldn't it? The Exchange Act grants the Commission specific authority to regulate exchange fees in Section 19B and 19C. That's why the general rulemaking power in Section 11A.C.1 does not extend to access fees. But because there are not other provisions of the Exchange Act that are specific to regulating tick sizes, which are not a fee, there aren't specific provisions of the Exchange Act that override the Commission's general rulemaking power under Section 11A.C.1 with respect to tick sizes. The problem with the Commission's interpretation here is that it ignores that in multiple provisions of the Exchange Act, Section 6B.4 and Section 19B.3.A, the Congress expressly granted the Commission the authority to regulate exchange fees. That was my question. You're saying that 19B and 19C are limited to exchange fees, and I'm wondering where that limitation comes from. What the statute says is they have authority to regulate rules, any SRO exchange rule. And is there some understanding not stated in the text that that's just about fees? It's not limited to fees, Your Honor. But when we're addressing the ability of the Commission to set a tick size on an across-the-board basis, there are no substantive provisions of the Exchange Act that speak specifically to the issue of tick sizes. This is kind of your negative implication argument. You're saying that there's other provisions that specifically refer to fees. So the negative pregnant of that is you can't do fees across the board under this one. There's no other provision that refers to tick size. And so there's not the negative implication that you can't do tick size across the board. Is that the upshot of your view? That's exactly right, Your Honor. But then is the upshot of that, then, you don't dispute that where there's a move in the tick size, that also requires, in order to have a sensible scheme, a move in the fee also? Yes, to ensure that the fee is not more than one-half of the minimum pricing agreement. So the fee has to move, but you're saying if you do an across-the-board with the tick size, let's just, if we take the implications of your argument, it would be that there's no bar to doing an across-the-board move as to tick size. And then if you do that, you have to have an across-the-board move as to the fee also. It's just that you can't actually do it on an across-the-board basis. You have to do it on an exchange-by-exchange basis, even though you definitely have to do it across the board. And then we can talk about the amount. The Commission would need to coordinate its regulatory activity. The Commission sets and reviews exchange fees, including access fees, under Section 19B, dozens of times a year. That is how these fees are set in rules that are proposed to the Commission and reviewed or approved by the Commission. Even though there is a fee cap in place, the exchanges change their fees and have different fee schedules that they submit to the Commission literally dozens of times a year. In the words of the Commission on page 9 of its brief, the exchange's fee schedules are constantly changing. So the Commission absolutely could coordinate its regulatory efforts so that on the one hand it adopts an across-the-board modification to the minimum pricing increment under Section 11AC1. And on the other hand, modifies exchanges' access fees, either across the board for each exchange under Section 19C or on a fee-by-fee basis under Section 19B. That is the bread and butter of what the Commission does in reviewing proposed exchange. How long would it take to change the access fees across the board for all exchanges, billing exchange by exchange by exchange by exchange? I don't think it would be a difficult task at all. When you say difficult, I said how long would it take? Well, it would depend on the length of the notice and comment process that the Commission ordered. But the Commission can proceed on an exchange-specific basis under Section 19C. How does that work? So they have to do a notice and comment rulemaking for each individual exchange? Correct. And so then if they change the tick size, do they let that take effect while they're going through this individualized process, or do they then have to delay the tick size change for a year, two years, while it goes through this exchange-by-exchange-by-exchange notice and comment rulemaking process? I think they could pursue parallel tracks, Your Honor, and they could include a provision in the tick size amendment that provides that it doesn't— There's like 60-something exchanges, right? Or 16. 16, sorry. So they're going to have essentially 17 notice and comment rulemakings going on simultaneously, is your vision, all accomplishing the exact same thing they accomplished in the single notice and comment rulemaking, just doing it piecemeal. Well, there would certainly be economies of scale if the commission were to proceed with respect to all exchanges under Section— They could do it all at once. I just don't understand why Congress— You can do it across the board. You just have to do it in pieces. But there's nothing that says they couldn't do exchange-by-exchange-by-exchange across-the-board change. And they can do it all at once. What in the statutory text tells us that we care whether it's in a single notice and comment or 17 simultaneous notice and comment proceedings? So it seems to me that's really the only difference that you're talking about here. Or are you assuming that they will actually make different numbers for different exchanges? They may—different exchanges have different business models. I know, but they want to do it across the board. So then we're going to have litigation in these 16 cases about whether they were right to do it on their particular record. Your Honor, this court confronted a very similar issue in NASDAQ v. SEC, this court's 2020 decision, where the court held that the commission could not invoke Section 19D of the Exchange Act, which governs limitations on access to exchange services to regulate exchange fees because fees are not referred to in Section 19B, even though they are referred to in multiple other provisions of the Exchange Act, and because stretching the language of Section 19D's limitation on access provision to reach exchange fees would undermine the carefully calibrated statutory structure that Congress put in place here to provide for either. On the question of the possibility of different fees by different exchange, I think your preference, though, would be to have one fee across all of them. It's just that it shouldn't go below half of the tick size. No, Your Honor, we're not suggesting that the access fee charged by each exchange needs to be the same. This is an inherently individualized inquiry. Even today, with the 30 mils fee cap in place, exchanges don't all charge a 30 mils access fee. They provide volume discounts to some customers, for example. They have different fee schedules. So there would be variation, which is precisely why Congress provided for individualized review under Section 19B and 19C. But even if there is statutory authority here, the Commission acted arbitrarily, capriciously, in violation of its obligations under Fox Television and this Court's precedent by silently departing from the policy it announced in the fee pilot. Counsel, I want to get to the Fox issue, but I have one more question about the statutory authority, and I just want to make sure, do you agree that when we look at Section 19, 19B is essentially reactive. It governs what the SEC does when exchanges propose a rule change, and 19C is speaking to the SEC's affirmative authority. As a general matter, that's correct, right? That's exactly right. Okay. And then, so my question is, it would seem to me that if you had a negative inference about Section 11, you would have to arise from the proactive authority, because you're suggesting a limit on the SEC's proactive authority. And so my question is, what's your answer to the savings clause, which appears only in 19C and says, nothing herein shall limit the SEC's otherwise available rulemaking authority? It just seems like a potentially difficult point, and I want to give you a chance to respond. A couple of responses, Your Honor. First, the savings clause doesn't detract from the indicia of interpretive meaning that the other provisions of the Exchange Act that we've been discussing here this morning, Section 19B, which refers to exchange fees, Section 6B4, which refers to exchange fees, those other provisions aren't affected by the savings clause. The savings clause is analogous to a savings clause in a preemption provision or in the preemption setting, which makes clear that the statute by its terms doesn't expressly preempt state law, but that does not override the ordinary workings of conflict preemption principles, because Congress would not want states to enact measures that conflict with congressional directives. And the same is true here. The savings clause doesn't override the well-settled canon of statutory construction that a specific provision controls over the general, and that's because courts need to make sense of the statute as a whole. And if the Commission were able to invoke its general rulemaking power in the face of these specific grants of authority, it would create conflicts, it would lead to superfluity with respect to the specific grants of authority. Congress would not want its statute to be interpreted in that way. It would want to ensure that it is construed in a comprehensive manner that gives effect to all relevant provisions. Turning to the Commission's unacknowledged and unexplained change in position, in 2018, the Commission sought to embark on a fee pilot study because it could not determine whether there were adverse consequences from the exchange's fee and rebate model that would warrant regulation. In the words of the Commission at page 5292 of the fee pilot rule, quote, further study in this area is warranted before permanently adopting any changes through rulemaking. Six years later, at JA 138 in the access fee rule, the Commission declared the Commission disagrees with commenters' suggestions that further study be conducted before adopting the amendment. So the Commission here, after this court held that it lacked the authority to proceed with the fee pilot, proceeded to promulgate the same reduction in the access fee cap that it sought to study in 2018, but failed to acknowledge its prior uncertainty on that issue and failed to explain what had changed. Why was it that in 2018, the Commission issued a 100-page rule explaining why it did not know the consequences of an access fee cap reduction for transaction costs, for order flow between exchanges and off-exchange venues, for potential broker-dealer conflicts of interest? And then after this court disapproved the fee pilot, the Commission plows ahead with the same measure, but does so without acknowledging the fee pilot? What's your best authority that FOX's requirement that you acknowledge a change in policy applies when an agency has said in 2018, we're hearing from some people that there's a problem with this, hearing different views from others, we don't yet know. We need information to make a decision about whether a regulatory change is needed. They try one approach to getting that information. They're told you can't do it through this pilot program. And then in the ensuing years between, we're only talking about a short period of time, you said six years here, they go and get other studies, economic studies that were not cited in the fee pilot rule, additional studies and experience, and a decision is made to change the tick size. And so this has just been one sort of long process of regulatory review that has now culminated in the rule before us. It was just in 2018, they said, we need more information. And they tried one way to get information, and now they're trying another. So what is your best case that their statements in 2018 that we need to get more information before we can make a call on this, are the types of policy positions that agencies have to acknowledge a change from when they adopt a different policy? Your Honor, FOX itself is our best authority, because this change in position falls within the heartland of FOX. In 2018, there were commenters who urged the commission to move forward with permanent regulation at that point. And the commission said, no, we don't know whether there's a problem here. They didn't say no, we're not going to change policies. They said, wait, we can't do that without getting more information. Now, had they said exactly what you just said, no, we are not making that policy change. We're sticking with this access fee for these reasons. And then they switched. Now, that would definitely be a change. But they didn't. What their no was was a no, hang on. We're hearing from different parties here, and we need more information. And you've just had a six-year-long effort by the agency to get the information, and then mixing in a tick-sized change that meant, well, we've got to make some change. It doesn't feel like there was any sort of locked-in policy determination. It was just a we need to get information. And they still agreed that they needed to get more information. They didn't act without anything. They took another few years before they acted. Your Honor. That was what was going on in Fox. The commission declined to move forward with a permanent reduction in 2018. Because it didn't yet have enough information. And then it went and two things happened. It went and got more information. And, two, it made a tick-sized change that required movement. As you agree, and your clients agree. And so they didn't make a locked-in policy determination in 2018. They said, we can't do this without more information. And they got more information. If I may take those two points separately. First, with respect to the additional study. I acknowledge the commission did more work between 2018 and 2024. There is additional material in the 2024 rulemaking record that was not before the commission in 2018. But what Fox requires, what the APA requires, is that the commission first display awareness that it is changing position. I'm sorry, I think we're crawling past each other. Because what I'm saying is, what position changes are covered by Fox? Now, Fox talks about a policy that was adopted there. No policy was adopted in 2018. All they said was made a decision that before we can make a policy decision, we need information. We don't know without information. Are you saying that every time an agency says, we need to gather more information. And then it gets some more information. And we can't decide without that information. And then later it gets more information. It has to acknowledge that before it said, we couldn't make this decision without getting more information. Yes, Your Honor. When the commission spends. But they just agreed they got more information. When the commission spends 100 pages of the Federal Register in 2018 explaining why regulation is not appropriate now. Because we can't answer these fundamental questions. And we need more information. And when the commission turns around six years later and concludes that it now has the information. What it needs to do is, number one, acknowledge that six years earlier it didn't have the information. And then explain what it changed. This case that says, hey, we need information. And then we go get information. And then we don't act until we get new information. Is a policy change as opposed to simply sort of how the world works? Your Honor. Fox is talking about policy changes in which reliance interest can be made. But all it said was we need more information. Do you have a case that says that's not a policy decision? Your Honor. A judgment that we have to make informed decisions. I would respectfully disagree with the position that the fee pilot was not a policy position. Commenters urged the commission in 2018 to move forward with permanent regulation. Did other commenters urge them not to? Yes. Okay. And the commission decided that its policy was to conduct the fee pilot and engage in additional fact gathering before making a decision about whether there is a problem here even worthy of regulation. And that was the fault that this court identified when it vacated the fee pilot. That the commission. So suppose and we put aside the tick size change, which seems to me to be a pretty significant development. But just putting that to the side for a second. Suppose that nobody challenged the pilot program. And the pilot program operated as envisioned. And then based on the information that was gotten in the pilot program, the commission adopts a permanent change in the access. At that point, is there, does Fox require that as a preamble statement to the change in the access fee that the agency says? We know that in the pilot program. We thought we needed to get more information. We've now gotten that information and that's why we feel comfortable as a result of the pilot program. And that's why we now feel comfortable instituting a change in the access. Yes, that is reason decision just obvious. I mean, just, I don't, I don't know what the, I'm not sure what the point is of acknowledging something. That just seems like that was the design all along. I mean, of course it could do it. It's not harmful to do it. But I'm not sure I understand what's particularly meaningful about doing this, about doing it. Because the regulated community and courts need to know why the commission is comfortable reaching a decision today. And you have, there's 150 pages of explanation about why the commission is reaching the conclusion that it is. But the commission didn't explain what is different. What had changed? What is available to it today that was not available to it in 2018? Why was it that in 20? On the face of the record, you admitted that the new studies are there and the tick size changes there. With respect to the tick size. Let me. I mean, it's like right there on the face. Your position might mean every time an agency issues and NPRM. When it then makes its final rule as part of its final rule, it has to say. Back in our notice of proposed rulemaking, we solicited people's views on this issue so that we could make a more informed decision. We are now acknowledged that we had that prior position, and we are now saying we have enough information. Thank you very much. And now we're going to make a permanent decision. You're saying Fox requires that. I'm saying that Fox requires reasoned decision making. No, that's not. There's nothing on. Is there anything unreasoned about doing an NPRM, getting the information, doing notice and comment, doing a final rule that's fully justified in the record without without including the line that says, by the way. We acknowledge that at the time of our NPRM, we didn't yet have the information we wanted to make a decision. The NPRM is not a policy, but what reason decision making even in that setting would require is how was the statement here that we need more information, a policy in a way that because they did keep getting the information. But how is that a policy in a way that an NPR lots of NPRMs will say we solicit, you know, the industry's views. We solicit the public's views on X or Y question. As we go through this process, we understand there's differing views. How is it different? The pilot was final agency action that sort to deliver a exogenous shock to the securities market so that the commission could gather data that it lacked in twenty eighteen. And what we are asking the commission to do purpose of an NPRM to gather information that the agency lacks to make a final agency decision. It is your honor. And I was worried like there's a lot of NPRMs and then final rules out in this world where the final rule doesn't make the sort of confession of lack of sufficient information that you seem to say Fox requires. In a reasoned final rule in that context, your honor, the agency would say, here's the data we gathered. This is why it enables us to reach a final decision about this question. There wasn't a final decision in the pilot rule other than we've decided to do a pilot study. There was a final decision. There was a pilot study that was a to get information we don't have to determine whether there was a problem worthy of regulation, which means that when the commission six years later determines that there is supposedly a problem here, that reducing the access fee cap will. I mean, supposedly, I thought people broadly agreed they had to reduce it, at least because of the tick size. Yes, your honor. Putting your clients or most of your clients. We agree that to a common supposed change, it's your honor. The exchanges don't agree with the commission's assessment of the supposedly adverse consequences of the exchanges fee and rebate model to be sure if the commission is going to move forward with a reduction in the tick size increments, then there does need to be a reduction in the fee cap so that the fee cap does not exceed half of the minimum pricing increment. But with respect to the tick size reduction. So, yeah, I want you to get a tick size reduction and just gateway to that. Can I just ask you suppose that at the beginning of the rule agency had said in twenty eighteen, we proposed a pilot program and the D.C. Circuit in its infinite wisdom vacated the authority to undertake the pilot program for the following reasons. We now institute a change in the access fee. Reason number one, we have to make a change in the access fee because the tick size is changing. And then for the reasons to be explained in the following dozens of pages, we arrive at the following figures for the access fee that results from the need to do it by virtue of changing the tick size. Would that would that have been enough? I think that's purposes. I think that's close. I think the commission would also need to say what is new in this record that we didn't have in twenty eighteen. So when they say the following reasons, the reasons that are said already set out in the rule include information that's come to light. I don't think you disagree with that, that it includes information that was not in the record for twenty eighteen. And anybody who reads that will reach that result. So it sounds to me like that kind of statement at the beginning of the rule would have been enough to address the Fox concern. That would be an acknowledgement of the commission's prior position. I would suggest that the commission also would need to specifically address what is this new evidence and why did it enable the commission to reach a determination about these issues that it wanted to study that it could not reach back in twenty eighteen? Why is this new study sufficient for the commission to determine that reducing the access fee cap will reduce transaction costs when in twenty eighteen it looked at this issue and could not make a determination? So suppose that then we come to the tick size question. So everybody agrees that something new happened in between twenty eighteen and this rule, which is that there was a decision made to change the tick size. And because that wasn't part of the pilot. So now that we've the commission's made the decision to change the tick size, which nobody challenges. Then there has to be a change in the access fee. So then we're just we're just talking about the degree of the change. Right. So that seems like a pretty significant difference from a pilot program to decide. The possible change in an access fee to a certain need to change the access fee because a decision, an unchallenged decision has been made to move the tick size. The commission is trying to reimagine and reconceptualize the access fee rule when it suggests that all that is going on here is a reduction in the fee cap to accommodate the new sub penny pricing increment. To be sure, with a half penny pricing increment, the fee cap needed to be reduced to twenty five mils so that it was not more than half of the sub penny pricing increment. But the commission reduced the access fee cap all the way down to ten mils. So if they had just if they had just reduced it to twenty five mils and didn't say anything about the pilot program, you would have been fine with that. If the commission had said we are reducing to twenty five mils to accommodate the new sub penny pricing increment, that was the end of the story. Then, yes, there would be no Fox issue. The problem here is that the commission explains it is reducing the fee cap for two reasons. At J.A. ninety nine, the commission says, quote, to accommodate the proposed smaller minimum pricing increments under proposed rule six, twelve, as well as to address the distortions that have developed under the access fee caps. The commission proposed to reduce rule six ten C's thirty mil cap. So there are two policy objectives here. One is to accommodate the new sub penny pricing increment. The other is to address supposed distortions to the market from the current exchange fee and rebate model. Those are the same alleged distortions that the commission could not determine in 2018. It just strikes me as quite different to say on one hand, without a compelled need to change the access fee, we want to study whether a change to the access fee is warranted. And if so, how much? That's twenty eighteen. And then later to say, well, we have to change the access fee. Everybody knows that it's got to go down to at least twenty five bills. And at that point, we should go ahead and just figure out what the best access fee is, because we don't have a choice about whether we're going to change it. That strikes me as quite different. And then to acknowledge just to have what seems to me to be a fairly boilerplate acknowledgement at the outset that we in a different context where there wasn't a need to change the fee altogether, we concluded that we weren't sure that the fee needed to be changed. And if so, by how much? And so we wanted further study. Now that we have to change the access fee, no matter what, we're just acting on the best information we have, see all the stuff we're going to do spelled out. And here's what we arrive at. The problem is that the reduction from twenty five mills, which is half of the subpenny pricing increment down to ten mills, was animated by the commission's concerns about supposed distortions in the market attributable to the fee and rebate model of exchanges. And the commission catalogs those concerns at length. In footnote 380 at JA122 states, these concerns include, for example, undermining price transparency, introducing unnecessary complexity through the proliferation of new exchange order types and order routing strategies, added market fragmentation, creating or exacerbating potential conflicts of interest between brokers and their customers, and in NMS stocks that are tick constrained, assessing a higher cost to liquidity demanders. Those are the issues that the commission tried to study in 2018. And when it determined here to reduce the access fee cap all the way down to ten mills, it needed to acknowledge its prior uncertainty and explain what had changed. And the fact that the commission here is trying to recharacterize the fee pilot rule, the access fee rule as animated solely by the new subpenny pricing increment is not borne out by the record. Last thing I'll say is that even if the commission has statutory authority, even if it's satisfied the change in position doctrine, the reduction to ten mills is not supported by the record because it rests on an inapt analogy to alternative trading systems, which are materially different from exchanges, and because there is not sufficient evidence in the record to substantiate that alternative trading systems actually charge ten mills as their average execution fee. I just have one. I need to clarify. I had thought your argument about what the change in position was a lot more specific than what we've been talking about. I thought, based on the brief, that it was page 5277 of the pilot program. They said, we are unsure if a reduction in the access fee cap will raise transaction costs. Then in the final rule here, they say, we are confident transaction costs will not go up. It was not just, we abstractly need more information, and now we don't need more information. The argument is all hinged around that shift. Am I understanding correctly? Those are all examples of where the commission in 2018 looked at an issue and concluded that it needed more evidence, needed to engage in study before reaching a determination. Then in 2024, it resolved that issue without acknowledging its prior uncertainty and without explaining what had changed. With respect to whether the reduced access fee cap would lower transaction costs for investors, whether it would divert order flow off exchange, whether it would ameliorate alleged conflicts of interest for broker-dealers, those are three examples of where the commission in 2018 could not reach a conclusion and why it decided that more study was necessary in 2018. And where in 2024, it failed to acknowledge its prior uncertainty. It failed to acknowledge its prior need for more study. Indeed, the commission did not even cite this court's fee pilot rule in the multi-hundred-page access fee rule order. And it cited the fee pilot rule itself only 11 times in this 200-page document, eight of which are citations to stale comment letters from the 2018 rulemaking. So there is no acknowledgment whatsoever, no substantive engagement with the record in 2018, no explanation as to why, to take your example, Your Honor, on page 5277 of the fee pilot rule, the commission said the commission cannot predict whether investors will face higher or lower transaction costs in this new equilibrium. And then turned around six years later at JA207 and said the commission expects that lowering the access fee cap will result in lower transaction costs for investors. No acknowledgment, no explanation as to why this record is different. My colleagues don't have any additional questions at this point. Okay. Thank you, Mr. Chairman. I'll give you a little time for rebuttal. From the commission now, Mr. Matro. Thank you. Good morning and may it please the court. Daniel Matro for the Securities and Exchange Commission. In the rulemaking below, the commission unanimously approved a reduction in the minimum pricing increment or TIC size for certain stock quotations from one penny to a half penny. Petitioners do not dispute that this widely supported TIC size reduction could not be implemented without a reduction in the existing access fee cap under Rule 610C. Petitioners supported reducing the access fee cap to 15 mils for stocks subject to the new half penny TIC and maintaining the current 30 mil cap for stocks that remain subject to a penny TIC. The commission, however, reasonably concluded that an access fee cap of 10 mils rather than 15 would more appropriately balance the competing concerns, and it reasonably chose to apply the cap to all stocks priced above $1 in light of the costs and risks associated with petitioners' proposed two-tier approach. Petitioners disagree with the balance that the commission struck, but they identify no valid basis to overturn it. Turning first to the statutory authority argument, petitioners do not dispute that access fee caps are needed to carry out the implementation or the commission's implementation of Section 11 Cap A's directives and that they promote the fairness and usefulness of quotation information. They thus essentially concede in their reply brief at footnote 2 that the commission has the authority to impose access fee caps under Section 11 Cap A and 23A1 of the Exchange Act. Instead, petitioners argue that Section 19B implicitly limits the commission's authority under those provisions to non-exchange trading centers, but that theory finds no support in the statutory text or in any principle of statutory interpretation. Section 19B requires the commission to determine whether exchange-initiated rules, including fee rules, are consistent with certain baseline statutory requirements, in which case the commission must approve them. And it sets forth certain procedures for commission review of exchange-proposed rules. But those procedures are not the exclusive mechanism by which the commission may regulate exchange fees. Section 19B sets the floor on commission oversight of exchange fees, not the ceiling. We know that because the very next provision, Section 19C, broadly empowers the commission to abrogate or modify exchange rules on its own initiative through a different set of procedures as it deems necessary or appropriate to further the purposes of the Act. And Section 19C, as Your Honor pointed out, expressly states that it does not limit any rulemaking authority granted elsewhere in the Act. So Section 19B can't plausibly be read to limit the commission's authority in Section 11 Cap A to adopt market-wide regulations. Those provisions encompass a broader range of market participants and are intended to serve fundamentally different statutory purposes. And I think it's important to point out that the commissioned Rule 610C does not just cover exchanges. It intentionally covers all trading centers that could potentially post displayed protected quotations. It prevents any trading center, not just exchanges, from charging fees beyond the cap to access those particular types of quotations. And so the implication of petitioner's theory is that, you know, in order to reach all of the set of potential trading centers in the national market system, the commission would have to proceed under a patchwork of different revisions with different procedures. Section 19C for exchanges, non-exchange trading centers under 11 Cap A, which is inconsistent both with Congress's intent. 11 Cap A provide for equal regulation of all market participants in the national market system. And it's just inconsistent with the text and the purpose of 11 Cap A. Can I ask a clarifying question about the change in position argument? So is your position that the SEC had some kind of materially new information and data, or is it more just that it conducted new and more extensive analysis and reached different conclusions than it did in 2019? It's some of both, Your Honor. There was definitely additional empirical data that it considered, additional comments, additional information that it took into account. But it also did a significant amount more analysis. What was the materially new information that – I'm not saying this was required. I just didn't see an emphasis on – I mean, the whole point of the pilot was to get more hard data, and you couldn't do that. Yeah, so I don't want to overstate that or suggest that it was all based on new data. But, of course, you've got the new comments. You've got data, considering data about ATS fees that are charged. You've got financial information from the exchanges that helped it determine. But ultimately, you had some economic studies, and certainly the commission itself did what the commission said in the TFP that it could have done. In the TFP, I think it's important to step back and recognize the commission didn't take any policy positions. It didn't take any view on the need for regulation or the market effects of the requirements that it was imposing. The only conclusion that it drew then was that the empirical evidence on the likely market effects of the TFP was uncertain. The commission hasn't changed its view now on the certainty of the empirical evidence that was before it in the TFP. But then, because it didn't have a regulatory impetus, the commission responded to that uncertainty by trying to gather additional data. It recognized, and this is on page 5248 of the TFP release, it recognized that it could have taken a position on those issues based on economic theory and its own judgment and expertise, but it chose not to. This court then held that it lacked the authority to do that, to impose new regulatory requirements without taking a position on those kinds of issues. But that uncertainty that it had in the TFP was not an important aspect of the problem or a relevant factor that it had to consider here in deciding what the appropriate fee cap reduction was in response to the tick reduction. First, because it didn't change its view on the certainty of the empirical evidence that was before it in TFP. It just faced with the need to reduce the excess fee caps to accommodate the tick size reduction. It undertook the analysis that it didn't do in 2019, applying its best judgment to determine the likely market effects of a change in fee reduction and what the right fee reduction would be based on economic principles, theory, and the available evidence, including old evidence and new evidence. So it didn't go on the relevant questions from uncertainty to certainty as petitioners would have it. It went from taking no position on those relevant issues to taking a position. And the other thing I'd point out is that petitioners allied the significant differences between the two initiatives. We've talked about some of them, but even with respect to the requirements they imposed, the two initiatives were materially different. What if an agency in one year says we're getting requests, competing information from all different parties on a really important policy change, but we do not have the information we need? We think the only reliable way, the only way that will effectively work for us to get that information, hard-to-access information, is to conduct this pilot program. And the court says you can't do that pilot program. And then a few years later, the agency says, okay, got a few more comments, found a study here or there. We're going forward. It doesn't acknowledge its prior statements that the only effective and reliable way to get that information is through a process that they're not lawfully allowed to do. Would they have to at that point if they had made those kinds of statements? I'm not saying that's what you did here. It's going to be at some point if an agency says we can't rule-make unless we have this information. Rule-makes without that information needs to acknowledge that. Yeah, I mean, I think that would be certainly a closer case under FOX or more similar to FOX where, you know, if an agency says, unlike what it said here, but if an agency were to say, you know, there's no plausible way of justifying regulation in this space under the data that we have available, the empirical data, regardless of any new circumstances, then that, you know, I think is something the commission or an agency may well have to address. But it's important to recognize that it wouldn't be an increased evidentiary burden that as petitioners would have it. It wouldn't be that the agency would then really have to identify new empirical evidence. This court and the Supreme Court have said that agencies can proceed in the face of regulatory uncertainty. What FOX mean says is that, you know, the inconsistent, it would have to provide a reasonable explanation for why it's departing from its previous statement. And here the commission provided, you know, extensive discussion of why it was acting, why it needed to do a fee cap reduction here and to accommodate the tick size. And why that made that made it a fundamentally different context from the TFP, where the commission didn't have any particular regulatory impetus that it needed to respond to. And so it chose to do a data gathering experiment. But that didn't foreclose it from regulating based on its own reasonable predictive judgments and its own best analysis of the likely effects of a fee cap reduction. So, you know, one of the examples they offer are these statements in the pilot program that it is uncertain whether a fee cap reduction is going to increase transaction costs. And then in this rule, there's a conclusion that reduction in the access fee cap is not going to increase transaction costs. And I think they're sort of common sense point is. You ought to acknowledge that you were uncertain before and explain how you got from point A to point B. What's the concrete kind of example? What's the difference? I think the difference is that in TFP, the commission made clear that it was the question it was focusing on because it didn't have a regulatory impetus was whether the empirical evidence before it resolves the debate among commenters, whether that the empirical evidence was sufficient alone to determine what the likely effects of the TFP would be. And the commission said, you know, we're not prepared to say that the evidence is certain on that. The empirical evidence is uncertain on that issue, but it did recognize, again, on 5248 of that release, that it could have gone ahead and taken a position on that issue on the likely effects on transaction costs or on order flow based on its best judgment, based on its expertise. But it didn't do that. It didn't need to do that. It turned out that that was, you know, this court said that it couldn't do that. It couldn't then impose burdens without taking that position. The commission here in a very different context with a specific regulatory impetus had where it had to reduce the fee, had to determine what the right fee, what the appropriate fee reduction would be, then had no choice to throw up its hands. But heeding the lesson of the court's decision in the TFP case, did the analysis that it didn't, the further analysis that it didn't do in TFP, and determined to the best of its ability what the likely impact on transaction fee costs and order flow is. And again, and the other point I'd make on that is just to emphasize the differences between the two initiatives that bear on the analysis of market effects. So, like, take, for example, the commission's conclusion that the rules here will reduce transaction costs for some stocks. Some of that reduction comes from stocks priced below $1, which were not a part of the TFP experiment. And the rest come from TIC-constrained stocks above $1, where the commission concluded that the fee reduction would result in lower costs for investors. TFP had no reason to focus on TIC-constrained stocks in its analysis because TIC was not part of, TIC reduction was not part of the experiment. And similarly, the commission concluded here that for non-TIC-constrained costs above $1, access fee funded rebates have the effect of narrowing spreads, and that would offset the cost of access fees to investors. And so that's why, you know, a few changes in fees and rebates won't affect the cost to investors for those stocks. But that type of adjustment can't happen if rebates are banned, which the TFP did for some stocks. And then again, and the last thing on that is here, the commission found that the TIC size reduction would itself reduce transaction costs and drive additional order flow to exchanges, offsetting any potential effects on the reduction in supply of liquidity for TIC-constrained stocks. And so that was another difference that the commission emphasized is, you know, offsetting impacts that was not an issue in the TFP. And then, you know, I think it's telling the petitioners don't identify any flaw in the commission's application of those of the economic principles that it looked to to make a determination. It doesn't identify any empirical evidence that contradicts it. It just it just points back sort of circularly to the commission chose not to take a position in the TFP. And it should have, you know, and it needed to distinguish that situation, which is distinguishable on its face because it was just for all the reasons that we've discussed. Make sure my colleagues don't have additional questions for you, Mr. Matra. OK, well, thank you, Your Honors. Thank you, Mr. Matra. Mr. Tehrani, we'll give you three minutes for rebuttal. Thank you, Your Honor. The fundamental change in position, the unacknowledged change in position by the commission, was that in 2018, it declared that it did not know whether there was a problem posed by the exchanges fee and rebate model that was worthy of regulation. It silently changed course in 2024 without acknowledging its prior uncertainty, without acknowledging this court's decision and without explaining what was new in this record that supported its conclusion that the exchanges fee and rebate model does, in the commission's view, pose a problem that requires reform. With respect to the question of whether there is a policy here, absolutely, there is a policy embodied in the fee pilot rules decision to proceed with study rather than regulation. But I would submit that the question of whether there's a policy or not is something of a red herring, because what we are focused on here is a fundamental principle of reasoned decision making. And when an agency, six years after declaring uncertainty about fundamental aspects of the securities market, changes course and purports to declare with confidence certainty on issues as to which it could not previously reach a decision, a reasoned decision maker, a reasoned agency would acknowledge its prior uncertainty. Imagine, and I know this is not your position, your view of this case at all, but imagine an agency had said in one year, we got to get it, we can't regulate this issue without getting a lot more information. We just don't have information to resolve the competing views we're hearing. We just don't have it. And then six years later, wow, they've got like seven economic Nobel laureates, they've got Congressional Research Service studies, they've got volumes, they've got an eight volume Federal Register record of evidence that uniformly points to the need to regulate and what the regulation should be. I'm not saying that's this case at all, but you had a record that unquestionably, adequately explained and justified both the change and the nature of the change, the line that was drawn. And no one was challenging that. No one was challenging that the decision was thoroughly reasoned and thoroughly explained. But they never mentioned their prior statements. Back then, they didn't have information and they needed to get it. Would the rule need to be thrown out? Yes, because an agency must display awareness. What does that add? How does that make their decision more reasonable? It shows that the agency is attentive to the course of its decision making process, and it allows courts and commenters to perfectly reasonably. So you're saying this is a whole level, no matter how reasonably explained and thorough the record is. There's just another requirement to have an opening sentence that says before we started our investigative process, we told you we didn't have enough information. Yes, because that's a fundamental indication of reasoned, careful, considered decision making required by Fox, required by this court's precedent, and required by the APA. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Millett; Garcia